## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ERIN DINGER, | : | |
| Plaintiff, | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| THE BRYN MAWR TRUST COMPANY, | : | No. 19-2324-WB |
| Defendant. | : | |

## MEMORANDUM

Schiller, J.                                                                October 11, 2022

Plaintiff Erin Dinger began working at Defendant The Bryn Mawr Trust Company (the "Bank") in 2009. She was terminated in January 2019 for allegedly refusing to return to work following a leave of absence precipitated by postpartum psychosis. Dinger asserts claims for disability discrimination, failure to accommodate, pregnancy discrimination, retaliation, and intentional infliction of emotional distress under applicable federal and state law. The Bank filed a motion for summary judgment on all claims. For the reasons that follow, the Bank's motion will be granted in part and denied in part.

## I.   BACKGROUND

Dinger was hired by the Bank in 2009 and worked there until her termination in January 2019. (Def.'s Statement of Undisputed Material Facts [Def.'s SUMF] ¶ 1; Pl.'s Statement of Disputed Facts [Pl.'s SDF] ¶ 1; Def.'s Ex. 41.) Dinger was promoted four times and received a raise every year during her employment. (Def.'s SUMF ¶¶ 2-4; Pl.'s SDF ¶¶ 2-4.) All of Dinger's performance reviews were positive and she never had any issues completing her work until her return from maternity leave in October 2018. (Dinger Dep. at 226:23-227:12.)

Dinger worked in the Trust Operations Department and her supervisor was Mary Agnes Leahy prior to her termination. (Def.'s Ex. 41; Def.'s SUMF ¶¶ 5-6; Pl.'s SDF ¶¶ 5-6.) Her job

duties included generating "reports of daily transactions within the wealth management division, analyzing business transactions," using spreadsheets to track funds flowing into and out of various accounts, and working on a Data Warehouse Project. (Def.'s SUMF ¶ 8; *see also* Pl.'s SDF ¶ 8; Dinger Dep. at 20:24-21:17.) Dinger was also responsible for a monthly cash flow report relied upon by senior management and created written instructions to enable other employees to complete the report. (Def.'s SUMF ¶¶ 10-11; Pl.'s SDF ¶¶ 10-11; Dinger Dep. 117:4-17.)

### A. <u>Maternity Leave and Return to Work</u>

In July 2018, Dinger requested and received 12 weeks of leave under the Family and Medical Leave Act (FMLA) following the birth of her second child. (Def.'s SUMF ¶ 12; Pl.'s SDF ¶ 12.) Before beginning her maternity leave, Dinger partially trained another employee, Hank McHugh, to complete the monthly cash flow reports. (Dinger Dep. at 115:18-116:10.) This training ended when Dinger agreed to work intermittently while on FMLA leave.[1] (*Id.* at 89:4-19, 117:23-118:6; Def.'s SUMF ¶ 16; Pl.'s SDF ¶ 16.)

After she exhausted her FMLA leave, Dinger returned to work in October 2018. (Def.'s SUMF ¶ 19; Pl.'s SDF ¶ 19.) Dinger worked for about six weeks until she developed postpartum psychosis in November 2018.[2] (Def.'s SUMF ¶ 19; Pl.'s SDF ¶ 19; Dinger Dep. at 10:17-19, 223:3-8.)

---

[1]     With respect to her decision to work while on FMLA leave, Dinger stated that she "didn't really feel as though [she] had a choice." (Dinger Dep. at 89:17-19.) Dinger testified that she "did not bring this up. [The Bank] asked [her] if [she] would [work while on maternity leave] and they suggested it would be a good idea to keep one foot in the door . . . while [she] was out on maternity leave." (*Id.* at 89:4-16.)

[2]     "Postpartum psychosis is an umbrella term for postpartum mania, psychosis, psychotic depression or a mixed state that refers to an acute, severe, mainly affective episode shortly after childbirth." Janneke Gilden et al., *Long-Term Outcomes of Postpartum Psychosis: A Systematic Review and Meta-Analysis*, 81:2 J. Clinical Psychiatry, at e1 (2020) https://www.psychiatrist.com/jcp/schizophrenia/psychotic-disorders/long-term-outcomes-of-postpartum-psychosis. "During the acute phase, patients frequently experience manic symptoms,

Dinger's symptoms included paranoia, insomnia, and a loss of appetite. (Dinger Dep. at 13:1-12.) From November 2018 until her hospitalization the following month, Dinger also "felt as though people were watching [her] through [her] TV." (*Id.* at 13:21-24.)

### B. **Dinger Requests Additional Leave**

On November 27, 2018, Dinger sent Leahy a text message asking to take a PTO day, which Leahy approved. (Def.'s SUMF ¶ 21; Pl.'s SDF ¶ 21; Def.'s Ex. 27.) The next day, Dinger's husband texted Leahy expressing the difficulty Dinger was having "with the transition back to work." (Def.'s SUMF ¶ 22; Pl.'s SDF ¶ 22; Def.'s Ex. 27.) That text message was the first notice the Bank received of Dinger's problems with returning to work. (Def.'s SUMF ¶ 23; Pl.'s SDF ¶ 23.) Dinger's husband was hopeful that Dinger would return to work the following week and inquired about "other options for necessary health-related leave" aside from PTO. (Def.'s Ex. 27; *see also* Def's. SUMF ¶ 24; Pl.'s SDF ¶ 24.) Later that week, on November 30, Allison Bisig, an Employee Benefits Specialist, emailed Dinger and her husband with information about how to apply for an Americans with Disabilities Act ("ADA") accommodation through Cigna and informed them of the Bank's Employee Assistance Program, which provides six free counseling sessions to employees. (Def.'s SUMF ¶ 30-31; Pl.'s SDF ¶¶ 30-31; Def.'s Ex. 29.)

Following a trip to the emergency room, Dinger was hospitalized at the Horsham Clinic from December 2 to December 6, 2018. (Def.'s Ex. 31.) On December 12, Dinger was examined by Dr. Deborah Kim, a psychiatrist. (Def.'s Ex. 34.) Dr. Kim's notes state that Dinger had an

---

severe depressive symptoms, and/or purely psychotic symptoms." Karin M. Burgerhout et al., *Functional Recovery After Postpartum Psychosis: A Prospective Longitudinal Study*, 78:1 J. Clinical Psychiatry 122, 122 (2017) https://www.psychiatrist.com/jcp/schizophrenia/psychotic-disorders/functional-recovery-after-postpartum-psychosis. "Episodes of postpartum psychosis are typically severe but limited in time. . . . Although the short-term prognosis for postpartum psychosis is very optimistic, following remission, most patients describe their acute episode as very stressful and even traumatic." *Id*. "Given the high relative risk for suicide and infanticide, early recognition and adequate treatment are of great importance." Gilden, *supra*, at e1.

"extremely anxious and sad" affect and Dinger complained of anxiety, paranoia, delusions, and loss of appetite. (*Id.* at 1-3.) Dr. Kim prescribed various medications and consulted Dinger and her husband regarding signs and symptoms that would require them to visit the emergency room again. (*Id.* at 3.) On December 19, Dinger and Dr. Kim returned a form to Cigna requesting an ADA accommodation that included her diagnosis of "Postpartum psychosis," a description of her symptoms, and her requested accommodation—a period of leave that was "expected" to end on March 15, 2019. (Def.'s Ex. 37.)

While Dinger was on leave, the Bank hired a consultant through the end of January 2019 to complete Dinger's work, including the cash flow reports she generated. (Def.'s Ex. 38.) In January, the Bank discussed potentially eliminating Dinger's position. Stephen Wellman, the Bank's Chief Operating Officer, stated in an email that he and Leahy "agreed that Erin Dinger's position in Wealth would be eliminated, and that Erin would be considered for a role with the data warehouse team." (*Id.*) Wellman also noted that Dinger was "not officially aware of the data warehouse role." (*Id.*) On January 5, June Falcone, Director of Banking Operations, wrote in an email that Dinger "will be transitioning to the Data Warehouse department." (Def.'s Ex. 39.) She noted that once the consultant's contract ended, the Bank will "have exposure" and if Dinger did not return to the Bank, it "would like to quickly replace her." (*Id.*)

Two days later, Cigna informed the Bank that Dinger was "approved for Short Term Disability benefits" from November 29, 2018 to January 28, 2019, but her request to take leave from January 29, 2019 to March 15, 2019 was still "pending." (Def.'s Ex. 42; *see also* Def.'s SUMF ¶ 37; Pl.'s SDF ¶ 37.) The January 7 email also said Dinger's request contained "incomplete paperwork" and "[i]mmediate [a]ction" was needed. (Def.'s Ex. 42.) The email advised the Bank that it was providing "the information (if any) provided by [Dinger] so that, to the extent possible,

[the Bank] can engage in the interactive process with [Dinger] to determine what, if any, reasonable accommodation can be provided." (*Id.* at 1-2.) It requested the Bank "reply to this email within 7 calendar days and inform Cigna of the outcome of the interactive process." (*Id.* at 2.) The record does not show that the Bank contacted Dinger following receipt of this email.

### C. **Dinger's Termination**

On January 16, 2019, Vice President of Human Resources Nicola Fryer and Allison Bisig spoke with Dinger over the phone about her request for leave until March 15. (Def.'s SUMF ¶ 44; Fryer Decl. ¶¶ 1, 3.) Fryer "asked Dinger if she could commit to returning to work at [the Bank] on a particular date, even if that date was the March 15, 2019 estimated date supplied by her doctor." (*Id.* ¶ 5.) Alternatively, Fryer asked Dinger if she would be willing to ask her doctor if she could resume working earlier than March 15. (Dinger. Dep. at 157:8-158:12.) Fryer explained that the March 15 date "was too uncertain" or "too far out" for the Bank to continue covering Dinger's position. (Dinger Dep. at 159:2-18; Fryer Decl. ¶ 7.) Because Dinger was not able to commit to a particular return date and was not willing to ask her doctor to clear her to return to work sooner than March 15, Fryer told Dinger that she was being terminated. (Dinger Dep. at 163:9-22; *see also* Fryer Decl. ¶¶ 6-8.)

Dinger stated that during the call, "there was no engagement . . . about my accommodation for March 15th. It was just simply if I could go back to my doctor and request . . . for me to come back sooner." (Dinger Dep. at 160:24-161:12.) Dinger testified that the entire phone call lasted "less than five minutes." (*Id.* at 163:23-164:2.)

The Bank maintains that prior to the January 16 call, Bisig "engaged in the interactive leave process on multiple occasions" with Leahy, Wellman, and Falcone and they determined that Dinger's "absence caused an undue hardship on the business due to [Dinger] being in a very critical, singular role." (Def.'s Ex. 41 at 2.) The Bank's "Termination Summary & Notes"

regarding Dinger's employment states that because Dinger's "return to work date was expected but not definitive," it was "not able to keep her position open." (*Id.*) On January 17, Cigna emailed Bisig to follow up about Dinger's status and her request for an ADA accommodation. (Def.'s Ex. 42.) Bisig replied that the Bank "cannot support the request for continuous leave." (*Id.*)

Although she was terminated, Dinger testified that she was ready to return to work in March, as Dr. Kim originally expected. (Dinger Dep. at 17:17-20; *see also* Ex. 37.) As of March 15, 2019, Dinger's original proposed return date, the Bank had not yet filled her position, and on March 19, the Bank reached out to Dinger and offered to reinstate her employment. (Def.'s Ex. 48, 50; Def.'s SUMF ¶¶ 65, 67; Pl.'s SDF ¶¶ 65, 67.) Dinger declined this offer because she was offered a role in the IT Department, which she believed had high turnover, and she felt disrespected by the Bank during the course of these events. (Dinger Dep. at 7:15-23, 44:21-45:21.).

### D. <u>Procedural History</u>

Dinger filed a complaint with the Equal Employment Opportunity Commission ("EEOC") and Pennsylvania Human Rights Commission ("PHRC") on February 9, 2019. (Def.'s SUMF ¶ 56.) The EEOC issued a right to sue letter on March 7, 2019 (Def.'s SUMF ¶ 59.) This lawsuit was filed within 90 days and is therefore timely.

## II.   <u>STANDARD OF REVIEW</u>

Summary judgment is appropriate where admissible evidence fails to demonstrate a genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). Material facts are those "that could affect the outcome" of the proceeding, and "a dispute about a material fact is 'genuine' if the evidence is sufficient to permit a reasonable jury to return a verdict for the non-moving party." *Lamont v. New Jersey*, 637 F.3d 177, 181 (3d Cir. 2011). When the movant does not bear the burden of persuasion at trial, it may meet its burden on summary judgment by

showing that the non-moving party's evidence is insufficient to carry its burden of persuasion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). Thereafter, the non-moving party may demonstrate a genuine issue of material fact if it provides evidence sufficient to allow a reasonable finder of fact to find in its favor at trial. *Anderson*, 477 U.S. at 248. "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Daniels v. Sch. Dist. of Phila.*, 776 F.3d 181, 192 (3d Cir. 2015) (quoting *Anderson*, 477 U.S. at 252).

In reviewing the record, "a court must view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor." *Armbruster v. Unisys Corp.*, 32 F.3d 768, 777 (3d Cir. 1994). The court may not, however, make credibility determinations or weigh the evidence in considering motions for summary judgment. *See Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 150 (2000); *see also Goodman v. Pa. Tpk. Comm'n*, 293 F.3d 655, 665 (3d Cir. 2002).

## III.   DISCUSSION

Dinger sued the Bank for disability discrimination failure to accommodate, pregnancy discrimination, retaliation, and intentional infliction of emotional distress. The Bank seeks summary judgment on all counts. The Court will grant the motion with respect to Dinger's claims for retaliation and intentional infliction of emotional distress and deny the motion with respect to Dinger's claims for disability discrimination, failure to accommodate, and pregnancy discrimination.

### A.  **Disability Discrimination**

Discrimination claims under the ADA are subject to the *McDonnell Douglas* burden shifting framework.[3] *Gavurnik v. Home Props., L.P.*, 227 F. Supp. 3d 410, 416 (E.D. Pa. 2017) (citing *Benko v. Portage Area Sch. Dist.*, 241 F. App'x 842, 845 (3d Cir. 2007)). Under that framework, the plaintiff bears the initial burden to establish a prima facie case, at which point, the burden of production then shifts to the defendant to "articulate some legitimate, nondiscriminatory reason for the" adverse employment action. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). If the defendant satisfies its burden of production, the plaintiff "must be afforded a fair opportunity to demonstrate that [the defendant's] assigned reason" was merely pretext for discrimination. *Id.* at 807. Throughout this process, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981).

To establish a prima facie case of disability discrimination under the ADA, Dinger must show: "(1) [she] is a disabled person within the meaning of the ADA; (2) [she] is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) [she] has suffered an otherwise adverse employment decision as a result of discrimination." *Gavurnik*, 227 F. Supp. 3d at 419 (quoting *Taylor*, 184 F.3d at 306).

### i.  **Disabled Person**

The parties do not dispute whether Dinger had a disability when she requested a leave of absence. Furthermore, pregnancy is not a health neutral event. The complications and medical conditions that often accompany pregnancy may fall within the ADA such that a woman is entitled

---

[3]    Dinger asserts disability discrimination claims under both the ADA and the Pennsylvania Human Relations Act (PHRA). The Court will only discuss Dinger's ADA claim because the "analysis of an ADA claim applies equally to a PHRA claim." *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 306 (3d Cir. 1999) (citing *Kelly v. Drexel Univ.*, 94 F.3d 102, 105 (3d Cir. 1996)).

to the same protections that would be afforded any other disability under the statute. *See, e.g.,* *Brown v. Aria Health*, No. 17-1827, 2019 WL 1745653, at *4 & n.1 (E.D. Pa. Apr. 17, 2019); *Moore v. CVS Rx Servs., Inc.*, 142 F. Supp. 3d 321, 344-45 (M.D. Pa. 2015).

### ii.  Otherwise Qualified

The majority of the Bank's arguments in support of summary judgment on Dinger's disability discrimination claim concern the second element, which requires that Dinger be "otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer." *Gavurnik*, 227 F. Supp. 3d at 419. The Bank proffers several arguments as to why Dinger cannot show that she was otherwise qualified. The Bank argues that Dinger was not able to return to work on the date that she was terminated, or that she was not willing to commit to a return date at the time of her termination, or that her accommodation was unreasonable as a matter of law and therefore she is not "otherwise qualified." (Def.'s Mem. of Law in Support of its Mot. for Summ. J. [Def.'s Mem.] at 9-12.) These arguments are largely specious.

The ADA defines a "qualified individual" as one "who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). "This inquiry can be divided into two parts: '(1) whether the individual has the requisite skill, experience, education and other job-related requirements of the position sought, and (2) whether the individual, with or without reasonable accommodation, can perform the essential functions of the position.'" *Sowell v. Kelly Servs., Inc.*, 139 F. Supp. 3d 684, 700 (E.D. Pa. 2015) (quoting *Turner v. Hershey Chocolate U.S.*, 440 F.3d 604, 611 (3d Cir. 2006)).

The first prong of this test is not disputable. Throughout her near-decade tenure at the Bank, Dinger was a valued employee who received a dozen raises and consistently positive performance

reviews. (*See* Def.'s Ex. 41.) With respect to the second prong, the Bank argues that Dinger is not otherwise qualified to perform the job because she was unable to return to work on the date of her termination. Further, the Bank argues that Dinger's request for a continued leave of absence was not a reasonable accommodation because it did not have a definitive end date. (Def.'s Mem. at 10-12.) Based on the record before it, the Court finds that a reasonable jury could conclude otherwise.

### a.  **A Leave of Absence Can Be a Reasonable Accommodation**

"A leave of absence for medical treatment may constitute a reasonable accommodation under the ADA."[4] *Sowell*, 139 F. Supp. 3d at 700 (citing *Conoshenti v. Pub. Serv. Elec. & Gas Co.*, 364 F.3d 135, 151 (3d Cir. 2004)). However, the leave of absence must "enable the employee to perform his essential job functions in the near future." *Gardner v. Sch. Dist. of Phila.*, 636 F. App'x 79, 84 (3d Cir. 2015) (quoting *Conoshenti*, 364 F.3d at 151); *see also Taylor*, 184 F.3d at 311 (explaining that for the reasonable accommodation analysis, "[t]he critical issue is whether [plaintiff] could, with reasonable accommodations, perform the essential functions of her job following her return from hospitalization").

The Bank cites *Garner* for the proposition that "[i]f a plaintiff claims that he could not do his job with or without reasonable accommodation at the time of his adverse employment determination, he cannot make out a prima facie case of discrimination under the ADA." (Def.'s Mem. at 9 n.69 (citing *Garner v. Sch. Dist. of Phila.*, 63 F. Supp. 3d 483, 489-90 (E.D. Pa. 2014), *aff'd*, *Gardner*, 636 F. App'x 79).) But the leave Dinger requested was the reasonable accommodation that she believed would allow her to do her job. *See Bernhard v. Brown & Brown of Lehigh Valley, Inc.*, 720 F. Supp. 2d 694, 701 (E.D. Pa. 2010) (criticizing defendant for

---

[4]     This is further supported by the Appendix to the ADA's regulations, which states that "accommodations could include permitting the use of accrued paid leave or providing additional unpaid leave for necessary treatment" 29 C.F.R. § 1630.2(o), App.

"misread[ing] the ADA and the applicable case law" by arguing that employee "was not legally qualified under the ADA to perform his job" at the time of his termination because the accommodation requested was additional leave time). "It would be entirely against the import of the ADA if [Dinger] were not considered qualified because [she] was not able to perform [her] essential job functions during [her] leave, as leave itself was the accommodation requested." *Id.* Thus, "the dispositive question is whether this accommodation was indefinite and open-ended, or temporary and capable of rendering [Dinger] able to perform the essential functions of [her] job in the near future." *Sharbaugh v. W. Haven Manor, LP*, No. 14-1723, 2016 WL 6834613, at *11 (W.D. Pa. Nov. 11, 2016).

> ### b. <u>A Jury Could Conclude that Dinger's Requested Leave of Absence Was Not Indefinite and Was Reasonable</u>

The Bank argues that Dinger's requested leave of absence was indefinite and therefore was not a reasonable accommodation as a matter of law. (Def.'s Mem. at 11-12.) This interpretation is primarily based upon two facts: first, that Dinger's doctor wrote "expected" on the paperwork she submitted to Cigna next to the March 15, 2019 return date, and second, that during the January 16 phone call that ended in her termination, Dinger expressed reservations about whether she would be capable of returning to work on March 15. (*Id.*; *see also* Def.'s Ex. 37 at 3; Fryer Decl. ¶¶ 4-8.)

It is well established that an indefinite leave of absence is not a reasonable accommodation. *See Garner*, 63 F. Supp. 3d at 492 ("The weight of authority in the [Third Circuit], as well as other Circuits, clearly establishes that a leave of absence for an indefinite duration is not a reasonable accommodation."). This is logical, as indefinite leave directly contradicts the principle that the leave of absence should "enable the employee to perform [her] essential job functions in *the near future*." *Gardner*, 636 F. App'x at 84 (emphasis added).

A jury could conclude, however, that Dinger's requested period of leave was not indefinite. March 15 is, of course, a specific date on the calendar. A reasonable jury could find that Dr. Kim wrote "expected" next to the March 15 date, not to suggest Dinger required an indefinite leave of absence, but rather as a good faith attempt to be as transparent as possible about Dinger's recovery from a severe illness, which required hospitalization mere days before submission of the form. (Def.'s Exs. 31, 37.) An estimated date "is not unusual and does not automatically render [plaintiff's] request for a leave of absence open-ended and indefinite." *Sharbaugh*, 2016 WL 6834613, at *13; *see also Bernhard*, 720 F. Supp. 2d at 702 (finding whether doctor's certification stating plaintiff could resume working in "1-3 months" with trial employment beginning in "3 months (tbd)" constituted a request for indefinite leave was "a quintessential jury question").

The Bank's argument that Dinger expressed uncertainty regarding her request during the January 16 call with the Bank when she stated that she may not be ready to return by March 15 is similarly unconvincing. "[A]n employee with a mental illness may have difficulty effectively relaying medical information about his or her condition, particularly when the symptoms are flaring and reasonable accommodations are needed." *Taylor*, 184 F.3d at 315; *see also Sharbaugh*, 2016 WL 6834613, at *15 (explaining that inconsistencies between request for leave submitted by doctor and plaintiff's characterizations of leave in communications with defendant did "not render [plaintiff's] leave request indefinite and open-ended, as a matter of law"). A reasonable jury could conclude that Dinger requested a temporary period of leave that would enable her to perform the essential functions of her job in the near future. *Sharbaugh*, 2016 WL 6834613, at *16.

Ultimately, as the record indicates, Dr. Kim appears to have been correct about Dinger's recovery timeline, as Dinger stated she felt ready to return to full time employment in March.[5] (Dinger Dep. at 17:17-20.) Furthermore, a jury could find that the requested period of leave was reasonable.[6] *See Bernhard*, 720 F. Supp. 2d at 702 (concluding that "a reasonable fact-finder could certainly find that [plaintiff] was qualified for a position . . . with a reasonable accommodation of an additional three-month's leave").

### iii.  Adverse Employment Action

Despite the notation in Dinger's employee file stating that her termination was "[v]oluntary," the record clearly indicates that the Bank terminated her during the January 16, 2019 call between Dinger, Fryer, and Bisig after Dinger could not commit to a firm return date. (*See* Def.'s Ex. 41; Def.'s Mem. at 5-6; Fryer Decl. ¶¶ 4-10; Dinger Dep. at 163:9-22.) Her termination satisfies her burden to show that she suffered an adverse employment action. *See Decker v. Alliant Techs., LLC*, 871 F. Supp. 2d 413, 428 (E.D. Pa. 2012). Therefore, Dinger has met her prima facie burden for her disability discrimination claim.

---

[5]     The Bank points out that Dinger turned down a similar (and higher paying) job offer around her expected return date of March 15. (*See* Def.'s Mem. at 12.) However, a genuine issue of fact remains as to whether Dinger may have returned to the Bank at that time had the Bank granted her request for additional leave. *See Gilbert v. Kimberly-Clark Pa., LLC*, No. 16-6602, 2018 WL 5292113, at *7 (E.D. Pa. Oct. 25, 2018) (denying summary judgment even though plaintiff voluntarily delayed return to work because "the evidence nevertheless creates a genuine issue as to whether Plaintiff might have returned to work following a short-term leave").

[6]     It is not clear whether the relevant time period for purposes of this analysis should be from November 27, 2018 to March 15, 2019 (the requested leave of absence originally submitted to Cigna) or whether it should be limited to January 28, 2019 to March 15, 2019 (the portion of the request that was not granted). (*See* Def.'s Exs. 37, 42.) Regardless, the Court finds that a jury could conclude either period was a reasonable request.

### iv.   The Bank's Nondiscriminatory Reasons for Dinger's Termination

Since Dinger has established a prima facie case, the Bank must offer legitimate, non-discriminatory reasons for her termination to prevail. *See Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994). "The employer satisfies its burden of production by introducing evidence which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the unfavorable employment decision." *Id.* (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509 (1993)).

The Bank argues that it terminated Dinger because she exhausted her FMLA leave and was unable to provide a specific return date. (*See* Def.'s Mem. at 19-20.). But because the Court cannot conclude, as a matter of law, that Dinger was requesting indefinite leave, the Court cannot conclude that the Bank has provided a legitimate, non-discriminatory reason for her termination. *See Schneider v. Works*, 223 F. Supp. 3d 308, 318 (E.D. Pa. 2016) ("If Plaintiff requested indefinite medical leave, Defendant had a legitimate, non-discriminatory reason for termination. If Plaintiff requested finite medical leave, it is arguable that Defendant did not have a legitimate, non-discriminatory reason for termination."). Accordingly, the Court need not consider whether the Bank's purported reasons are pretextual.

### B.   Failure to Accommodate

Dinger also asserts an ADA failure to accommodate claim for the Bank's purported failure to engage in the interactive process. The Bank argues that it is entitled to summary judgment on this claim because it satisfied its burden to engage in good faith with Dinger, who was never able to identify a reasonable accommodation. (*See* Def.'s Mem. at 12-13.)

For an employer to be found liable for failure to accommodate, the plaintiff must prove "(1) [she] is a disabled person within the meaning of the ADA; (2) [she] is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) [she] has suffered an otherwise adverse employment decision as a result of

14

discrimination' . . . [which] in this context include[s] refusing to make reasonable accommodations for a plaintiff's disabilities." *Hohider v. United Parcel Serv., Inc.*, 574 F.3d 169, 186 (3d Cir. 2009) (quoting *Williams v. Phila. Hous. Auth. Police Dep't*, 380 F.3d 751, 761 (3d Cir. 2004)). Once an accommodation is requested, an employer has an obligation to engage in the "interactive process" with the employee. *See Taylor*, 184 F.3d at 311. "Because failure to accommodate claims do not require that an employer's action be motivated by a discriminatory animus directed at the disability, the *McDonnell Douglas* burden-shifting framework does not apply." *Anderson v. Lowe's Home Ctrs., LLC*, No. 21-2292, 2022 WL 2134164 at *7 (E.D. Pa. June 14, 2022) (citing *Reyer v. Saint Francis Country House*, 243 F. Supp. 3d 573, 595 (E.D. Pa. 2017)). Furthermore, "failure to participate in the interactive process is not a ground for liability unless the employee has proven a failure to accommodate, namely, that a reasonable accommodation existed and the employer unreasonably failed to provide it." *Garner*, 63 F. Supp. 3d at 494 (quoting *Deily v. Waste Mgmt. of Allentown*, 55 F. App'x 605, 607 (3d Cir. 2003)).

Dinger has satisfied the first two prongs of this analysis. *See supra* Section I.A.i-ii. With respect to the third prong, the Bank argues summary judgment should be granted in its favor because "Dinger's request for an indefinite, undetermined amount of additional leave based on her inability to commit to a return date cannot as a matter of law constitute a reasonable accommodation." (Def.'s Mem. at 13.) However, the Court has already rejected this argument. Accordingly, the Court will assess whether the Bank has shown it engaged in the interactive process with Dinger after her request for a reasonable accommodation.

"To show that an employer failed to participate in the interactive process," a plaintiff must demonstrate: "1) the employer knew about the employee's disability; 2) the employee requested accommodations or assistance for her disability; 3) the employer did not make a good faith effort

to assist the employee in seeking accommodations; and 4) the employee could have been reasonably accommodated but for the employer's lack of good faith." *Taylor*, 184 F.3d at 319-20. The first two prongs cannot be reasonably disputed. As for the final two prongs, the Bank argues it made the required good faith effort by communicating with Dinger and her husband when she requested additional leave, coordinating with Cigna regarding Dinger's request, contacting Dinger regarding her request, and calling her on January 16, 2019 to discuss the status of her leave. (Def.'s Mem. at 13-14.) However, based on the record, the Court finds a reasonable jury could conclude the Bank failed to engage in the interactive process with Dinger.

The Bank worked with Dinger and her husband to make reasonable accommodations for her when she first requested additional leave. But after that, the Bank failed to initiate a meaningful dialogue with Dinger regarding her request. According to the record, the Bank had no communications with Dinger following her initial leave request until her termination.[7] Once an employer is aware of an employee's request for an accommodation, it "cannot escape its duty to engage in the interactive process" by "simply [siting] back passively, offer[ing] nothing, and then,

---

[7]     The Bank references its own self-described "Interactive Leave Process" in Dinger's "Termination Summary & Notes," a document that was written either by Fryer, Bisig, or "someone in HR." (Def.'s Ex. 41; Sanchez Dep. at 345:13-16.) It states that "Bisig engaged in the interactive leave process on multiple occasions" with Leahy, Wellman, and Falcone. (Def.'s Ex. 41 at 2.) Curiously missing from its discussion of this process is Dinger herself. This document lends support to Dinger's statement that "there was no engagement . . . about [her] accommodation," and instead, the Bank asked if she "could go back to [her] doctor and request . . . for [her] to come back sooner." (Dinger Dep. at 160:24-161:12.) Furthermore, although the Bank points out it engaged in the interactive process by initially communicating with Dinger's husband and contacting Cigna, the Bank does not appear to have informed Dinger that Cigna told the Bank "that Dinger's leave request had 'incomplete paperwork' and that Cigna had 'not received the information requested from the employee' in order to process her request for leave as an accommodation." (Def.'s SUMF ¶ 43 (citing Def.'s Ex. 42).) Nor is there record evidence that the Bank took any action after being informed by Cigna that it should "to the extent possible . . . engage in the interactive process with [Dinger] to determine what, if any, reasonable accommodation can be provided" despite Cigna's request to "reply to this email within 7 calendar days and inform Cigna of the outcome of the interactive process." (Def.'s Ex. 42 at 1-2.)

in post-termination litigation, try to knock down every specific accommodation as too burdensome." *Zombeck v. Friendship Ridge*, No. 08-1626, 2011 WL 666200, at *15 (W.D. Pa. Feb. 14, 2011) (quoting *Taylor*, 184 F.3d at 315, 317). Nor can the Bank prevail on summary judgment based on its belief that Dinger was not covered by the ADA. (*See* Def.'s Mem. at 14.) "Defendant's mistaken belief that plaintiff was not covered by the ADA and subsequent refusal to discuss the feasibility of her requested accommodation support a jury finding that it failed to engage in the interactive process." *Zombeck*, 2011 WL 666200, at *16. Accordingly, making all inferences in favor of Dinger, as it must at this stage, the Court finds material questions of fact remain as to whether she could have been reasonably accommodated but for the Bank's lack of good faith.

### C. **Undue Hardship**

Under the ADA, "[i]t may be a defense to a charge of discrimination . . . that a requested or necessary accommodation would impose an undue hardship on the operation of the covered entity's business." 29 C.F.R. § 1630.15(d). An "undue hardship" is "an action requiring significant difficulty or expense" in light of several factors. 42 U.S.C. § 12111(10)(A). Those factors include "the nature and cost of the accommodation," "the overall financial resources of the covered entity," and "the type of operation or operations of the covered entity." *Id.* § 12111(10)(B)(i)-(iv). The Bank argues that Dinger's request for an indefinite leave of absence posed an undue hardship to its business because of her role in generating cash flow reports and because the consultant hired to take her place was leaving the Bank at the end of January 2019. (Def.'s Mem. at 15.) Although the Court has already determined that questions of fact remain with respect to whether Dinger's requested leave was indefinite, it will briefly address this issue.

To withstand this defense, a plaintiff must show that she is qualified for the position or that she would be qualified with a reasonable accommodation. *See Rex v. Timbar Packing & Display*,

No. 10-2371, 2012 WL 5182882, at *5 (M.D. Pa. Mar. 19, 2012), *report and recommendation adopted*, 2012 WL 4973371 (M.D. Pa. Oct. 17, 2012); *see also Walton v. Mental Health Ass'n of Se. Pa.*, 168 F.3d 661, 670 (3d Cir. 1999). To establish that an accommodation is reasonable, a plaintiff must show that its costs do not clearly outweigh its benefits. *Rex*, 2012 WL 5182882, at *5; *see also Walton*, 168 F.3d at 670 (explaining that district courts should only grant summary judgment "for defendants in cases in which the plaintiff's proposal is either clearly ineffective or outlandishly costly" (quoting *Borkowski v. Valley Cent. Sch. Dist.*, 63 F.3d 131, 139 (2d Cir. 1995)); *Turner*, 440 F.3d at 614 (explaining that a "proposed accommodation" must be "possible"). If a plaintiff does so, "the burden shifts to the defendant to prove either that the accommodation is unreasonable or that it creates an undue hardship for the defendant." *Walton*, 168 F3d at 670; *see also Rex*, 2012 WL 5182882, at *5.

Dinger has met her burden because the fact that she was already afforded a leave of absence and the Bank hired a temporary consultant suggests that a further leave of absence was "possible." *Turner*, 440 F.3d at 614. The Bank argues that it would face an undue hardship if Dinger did not return to work because the temporary consultant it hired to create the complex monthly cash reports in Dinger's place was leaving the Bank at the end of January 2019.[8] (Def.'s Mem. at 15; Def.'s SUMF ¶¶ 10-11, 39, 42.)

The Bank's arguments are unavailing. Because the reports Dinger generated were monthly (Def.'s SUMF ¶ 11), there would have been only one or, at most, two reports to create while Dinger

---

[8] The Bank also argues that forcing it to reallocate the essential function of completing these reports constitutes an undue burden, but that argument is not persuasive. (*See* Def.'s Mem. at 15 (citing *Lombardo v. Air Prods. & Chems., Inc.*, No. 05-1120, 2006 WL 1892677, at *11 (E.D. Pa. July 7, 2006)).) Unlike the plaintiff in *Lombardo*, Dinger was not requesting that she be exempted from certain portions of her duties or that the essential function of her position be reassigned upon her return to work. *Lombardo*, 2006 WL 1892677, at *11. Rather, Dinger's request for an accommodation was for leave itself.

remained on leave from the time of her termination until March 15. The Bank has not shown that the temporary consultant could not have trained another employee to complete the report while Dinger remained on leave or that it could not have hired another temporary consultant to complete the report until Dinger returned. Moreover, although the Bank argues that it needed to fill Dinger's position "quickly," it remained open for at least two months after her termination, when the Bank offered to reinstate her.[9] (Def.'s Exs. 39, 50; Def.'s SUMF ¶ 65.) Finally, if the hardship posed by Dinger's requested leave was purely financial, the Bank could have asked Dinger to take unpaid leave, but nothing in the record indicates that such a conversation ever took place.

The Bank has not met its burden to establish an undue hardship on the facts in the record. Its motion for summary judgment as to Dinger's ADA claims will therefore be denied.

### D. **Pregnancy Discrimination**

The Pregnancy Discrimination Act of 1978 amended Title VII to expand protections against employment discrimination based on sex to include "pregnancy, childbirth, or related medical conditions." 42 U.S.C. § 2000e(k). The *McDonnell Douglas* burden shifting framework applies to Title VII pregnancy discrimination claims.[10] *Young v. United Parcel Serv., Inc.*, 575 U.S. 206, 228 (2015).

#### i. **Dinger's Prima Facie Case**

A prima facie case of pregnancy discrimination requires Dinger to show that "1) she is or was pregnant and that her employer knew she was pregnant; 2) she was qualified for her job; . . .

---

[9]     Despite the importance of the monthly reports to the Bank's management (Def.'s SUMF ¶ 11), the Bank does not explain who completed the reports while Dinger remained on leave after the consultant's contract ended.

[10]     Because Dinger's pregnancy discrimination claims under Title VII and the PHRA are "analyzed in an identical manner," the Court "will confine [its] discussion to Title VII." *Solomen v. Redwood Advisory Co.*, 183 F. Supp. 2d 748, 751 (E.D. Pa. Jan. 31, 2002).

3) she suffered an adverse employment decision" and 4) "there is some nexus between her pregnancy and her employment termination that would permit a fact-finder to infer unlawful discrimination." *Doe v. C.A.R.S. Protection Plus, Inc.*, 527 F.3d 358, 365-66 (3d Cir. 2008).

The Bank knew that Dinger was pregnant because it processed her request for FMLA maternity leave in July and she was on maternity leave following the birth of her second child until October. (Def's SUMF ¶ 12.) The Bank was also aware at the time of Dinger's termination that her requested absence was due to a medical condition related to pregnancy because the form her doctor submitted to Cigna on December 19 stated her diagnosis was "Postpartum psychosis" and her husband informed her supervisor that she was having issues transitioning back to work following maternity leave. (Def.'s Exs. 27, 37 at 3.) As noted above, *see supra* Section I.A.ii, the Court has already held that Dinger was qualified for her position and she suffered an adverse employment decision when she was terminated in January 2019. (*See* Fryer Decl. ¶¶ 8-10; Def.'s Ex. 41.) The first three prongs are therefore satisfied.

To establish causation, Dinger may rely upon the temporal proximity between her request for leave and her termination. *See Ahern v. Eresearch Tech., Inc.*, 183 F. Supp. 3d 663, 669 (E.D. Pa. 2016); *see also C.A.R.S. Protection Plus, Inc.*, 527 F.3d at 369 ("We have held temporal proximity sufficient to create an inference of causality to defeat summary judgment."). Although the Third Circuit has declined to draw a clear line as to when temporal proximity is no longer suggestive of discrimination, it "has stated that a span of days, and not months, satisfies the requirement because of the 'unusually suggestive' timing." *Ahern*, 183 F. Supp. 3d 669-70 (quoting *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 279 n.5 (3d Cir. 2000)).

Dinger first went on leave in November 2018 and her paperwork was submitted by her doctor on December 19, 2018, less than a month before her January 16, 2019 termination. (Def.'s

SUMF ¶¶ 27, 37; Def.'s Ex. 37.) Furthermore, the Bank admits that during the January 16 phone call, Dinger reiterated her need for leave until March and was then terminated. (Fryer Decl. ¶¶ 5-10; Def.'s Mem. at 5-6; *see also* Dinger Dep. at 163:9-22.) The temporal proximity between Dinger's request for leave for a pregnancy related illness and her termination establishes the fourth element of her prima facie case at this stage of the proceedings. *See C.A.R.S. Protection Plus, Inc.*, 527 F.3d at 369 (denying summary judgment where plaintiff relied on temporal proximity of three days); *Ciocca v. Heidrick & Struggles, Inc.*, No. 17-5222, 2020 WL 1550748, at *6 (E.D. Pa. Apr. 1, 2020) (finding plaintiff established prima facie case at summary judgment stage by relying on temporal proximity of one month between initially informing employer of pregnancy and termination). Dinger has therefore met her initial burden of establishing a prima facie case of pregnancy discrimination.

### ii.   The Bank's Nondiscriminatory Reasons for Dinger's Termination

The Court has already considered the Bank's nondiscriminatory reasons for Dinger's termination and concluded that she has raised issues of material fact that defeat summary judgment. *See supra* Section I.A.iv. Because a reasonable jury could find for Dinger on her pregnancy discrimination claim, the Court will deny summary judgment.

### E.   Retaliation

Dinger's complaint appears to state a claim for retaliation under the ADA. However, Dinger does not defend her retaliation claim, so the Court will grant summary judgment in the Bank's favor on this claim.

### F.   Intentional Infliction of Emotional Distress

Finally, Dinger asserts a claim of intentional infliction of emotional distress. The Bank argues that the Pennsylvania Workman Compensation Act preempts this claim (Def.'s Mem. at 22.) Dinger "does not contest Defendant's Motion for Summary Judgment as to" this claim. (Pl.'s

Mem. of Law in Opp. to Def.'s Mot. for Summ. J. at 6 n.12.) Accordingly, the Court will grant summary judgment in favor of the Bank on this claim.

## IV.    **CONCLUSION**

For the reasons discussed above, the Court grants the Bank's motion for summary judgment as to Dinger's retaliation and intentional infliction of emotional distress claims. The Court will deny the Bank's motion as to Dinger's disability discrimination, failure to accommodate, and pregnancy discrimination claims.

An Order consistent with this Memorandum will be docketed separately.